UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL KREPS, et al.,

        Plaintiffs,                Case No. 22-cv-12020

v.

                            HON. MARK A. GOLDSMITH

MICHIGAN UNEMPLOYMENT
INSURANCE AGENCY, et al.,

        Defendants.

_____/

## OPINION & ORDER
## (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 110); and (2) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 71)

Plaintiffs are ten individuals[1] (together, Individual Plaintiffs) and the International Union of United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW). See 2d Amend. Compl. (Dkt. 36). Defendants are the Michigan Unemployment Insurance Agency,[2] Agency Director Julia Dale in her official capacity, Agency Deputy Director Kimberly Berry, Agency Internal Controls Division Director Teresa Burns, and Does 1–3 in their individual capacities. Id. Plaintiffs allege that they were entitled to prompt payment of unemployment benefits from the Agency, but that Defendants implemented illegal policies and procedures that improperly blocked and/or denied their payments. See id.

---

[1] They are: Paul Kreps, Diana Boudrie, Zachary Brazil, Robin Shipe, I.F. (a minor), Christine Holifield, Richard Brainer, Marissa Quigg, Patricia Myrold, and Andrew Myrold. 2d Amend. Compl. (Dkt. 36). Plaintiffs brought this case as a putative class action. Id.

[2] The Michigan Employment Security Act (MES Act), Mich. Comp. Laws § 421.1 et seq., grants authority to the Agency to operate Michigan's unemployment benefits program. 2d Amend. Compl. ¶ 146–147.

Both parties filed motions for summary judgment.  Pls. Mot. Summ. J. (Dkt. 71); Defs.

Mot. Summ. J. (Dkt. 110).  For the reasons that follow, the Court grants in part and denies in part

Defendants' motion for summary judgment and denies Plaintiffs' motion for partial summary

judgment.[3]

## I.    BACKGROUND

Plaintiffs' complaint is, at its core, two-pronged: (i) the Individual Plaintiffs allege that

Defendants violated their constitutional due process rights in their handling of traditional

unemployment insurance (UI) claims and Pandemic Unemployment Assistance (PUA) claims; and

(ii) the UAW alleges that Defendants breached a settlement agreement reached in a separate case,

Zynda et al. v. Arwood et al., No. 15-cv-11449 (E.D. Mich.).  See, generally, 2d Amend. Compl.

Defendants deny both of Plaintiffs' allegations.  See Berry's Answer to 2d Amend. Compl. (Dkt.

44); Burns' Answer to 2d Amend. Compl. (Dkt. 45); the Agency's Answer to 2d Amend. Compl.

(Dkt. 47); Dale's Amend. Answer to 2d Amend. Compl. (Dkt. 49).

The Court will provide some context related to the traditional unemployment insurance

program and the pandemic unemployment assistance program before discussing the Plaintiffs'

constitutional claims related to these benefits.

As to traditional unemployment benefits, Congress enacted the unemployment insurance

benefits program as part of the Social Security Act enacted in the 1930s.  See 42 U.S.C. § 501 et

seq.  The Supreme Court has explained that the statute's purpose is "to provide a substitute for

---

[3] Because oral argument will not aid the Court's decisional process, the motions are decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motions for summary judgment, the briefing includes Defendants' response (Dkt. 83), Plaintiffs' reply (Dkt. 88); and Individual Plaintiffs' response (Dkt. 129) the UAW's response (Dkt. 131), and Defendants' reply (Dkt. 136).

wages lost during a period of unemployment not the fault of the employee." California Dep't. of Hum. Res. Dev. v. Java, 402 U.S. 121, 130 (1971).

The statute structures the program as "a joint state-federal program," where each state "administers a separate unemployment insurance program, but all states follow the same guidelines established by federal law." See U.S. Dep't of Labor, Quick Links, https://www.dol.gov/general/topic/unemployment-insurance [https://perma.cc/YV6C-MMWS]; 42 U.S.C. § 502. Each state's unemployment program must be administered through a method "reasonably calculated to insure full payment of unemployment compensation when due[.]" Id. § 503(a). The Michigan Unemployment Insurance Agency administers the unemployment insurance program for the state of Michigan. See Mich. Dep't of Labor and Econ. Opportunity, Unemp. Ins. Agency, https://www.michigan.gov/leo/bureaus-agencies/uia [https://perma.cc/N534-NPXZ]. Neither party disputes that, once claimants satisfy certain UI eligibility requirements, they are "entitled to benefits under state and federal law." Cahoo v. SAS Analytics, Inc., 912 F.3d 887, 892 (6th Cir. 2019).

PUA benefits originate from a separate statute than traditional UI benefits. Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 15 U.S.C. § 9001 et seq. and established the Coronavirus Relief Fund, 42 U.S.C. § 801, to provide states with funds to, among other things "cover only those costs of the State . . . that are necessary expenditures incurred due to the public health emergency with respect to . . . the Coronavirus Disease 2019 (COVID-19) [and] were not accounted for in the budget . . . as of March 27, 2020, for the State[.]" 42 U.S.C. § 801(d). The CARES Act, 15 U.S.C. § 9021, provides for states to furnish PUA benefits "to individuals not typically eligible for regular unemployment, beginning retroactively on January

27, 2020."  2nd Amend. Compl.  ¶ 171.  The Michigan Unemployment Insurance Agency administered the PUA program in the State of Michigan.  Id. ¶¶ 172–173.

Plaintiffs contend that the Agency determined that all individually-named Plaintiffs were eligible for either UI or PUA benefits.  Id. ¶ 9.  They allege that the Agency violated their due process rights by:

> (a) Adopting and maintaining intentional policies to block prompt payment of benefits for claimants who are eligible for ongoing benefits under all final Agency Determinations.
>
> (b) Adopting and maintaining intentional policies to block prompt payment based on Agency Determinations that are not final, and before processing unemployment ("UI") claimants' protests and appeals.
>
> (c) Adopting and maintaining intentional policies of engaging in unauthorized collection activity based on Agency Determinations that are not final, and before processing claimants' protests and appeals.

Id. ¶ 2(a)–(c).

Specifically, Plaintiffs allege that Defendants' policies included an automated flagging system that placed benefits payments on an indefinite hold.  Individ. Pls. Resp. at 2 (Dkt. 129).  Plaintiffs argue that the "automated holds are often followed by automated determinations without any factfinding at all."  Pls. Mot. Summ. J. at 3.  Plaintiffs explain that Defendants' labels for these holds include "Benefit Payment Review" (BPR) holds and "Stop Payment Indicator" (SPI) holds.  Id. at 4.

A second policy that Plaintiffs argue Defendants utilized was a policy allowing the Agency to "begin[] collection activity once a claimant is found to have been ineligible for benefits previously received, even if the claimant has protested or appealed that Determination."  Id. ¶ 218 (capitalization in original).

The third policy that Plaintiffs cite to is a policy of "initiating collection of restitution (a/k/a 'overpayment collection') before a Determination on eligibility <u>and</u> a Determination on restitution have become final." <u>Id.</u> ¶ 238 (emphasis and capitalization in original).

Plaintiffs' complaint alleges: "Regardless of the program [UI or PUA], the Michigan Unemployment Insurance Agency is required to follow state law regarding eligibility [d]eterminations and overpayment collections activity and to adhere to federal law and U.S. Department of Labor guidelines requiring notice and opportunity to be heard, protection from governmental abuse of power, and other due process protections." <u>Id.</u> ¶ 173.  In sum, Plaintiffs' due process claims allege that, regardless of whether a claimant was eligible for PUA or traditional UI benefits, the Agency was required to provide them notice and an opportunity to be heard before blocking benefits or initiating collection of benefits, which it failed to do.  <u>See id.</u>

Plaintiffs' complaint also alleges that Defendants violated the settlement agreement reached in <u>Zynda</u> (the <u>Zynda</u> Agreement).  They allege that the <u>Zynda</u> Agreement was "designed to remedy these very same illegal practices to which the Agency and its Director were parties." <u>Id.</u> ¶ 5.

The <u>Zynda</u> Agreement, by its own terms, had two key aims related to unemployment benefit claims: (i) to ensure that the Agency complied with the law regarding overpayments and imposition of penalties, i.e., that the Agency would not collect overpayments prematurely; and (ii) to ensure that the Agency conducted fraud determinations with a higher level of scrutiny than it was operating under at the time of the <u>Zynda</u> lawsuit.  <u>See Zynda</u> Agr. (Dkt. 23-2, PageID.1058–1068).

## II.    ANALYSIS[4]

### A. Defendants' Motion for Summary Judgment—Constitutional Claims

Defendants' summary judgment motion argues that the Court should dismiss Plaintiffs' constitutional claims.  See Defs. Mot. Summ. J.  For the reasons set forth below, the Court agrees.

Plaintiffs bring constitutional claims that fall into two categories of claimants: (i) PUA Plaintiffs; and (ii) traditional UI Plaintiffs.  See 2d Amend. Compl.  The Court will address each category of Plaintiffs in turn.

### 1.    PUA-Based Claims

Defendants argue that Plaintiffs fail to establish that the law recognizes a constitutionally protected property interest in PUA benefits.  Defs. Mot. Summ. J. at 3–6.  Therefore, they argue, the Court should grant Defendants summary judgment as to all PUA Plaintiffs.  Id.  The Court agrees.

The Supreme Court has long recognized that certain property interests are protected under the Fourteenth Amendment's due process safeguards.  See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972).   The Supreme Court explained the circumstances where a constitutional property right arises:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the

---

[4] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.

Id.

"Recipients of unemployment compensation have constitutionally-protected property interests in unemployment benefits." Cahoo, 912 F.3d at 900 (citing Goldberg v. Kelly, 397 U.S. 254, 262 (1970)). And, indeed, Defendants do not dispute that individuals who qualify for traditional UI benefits have a property interest in those benefits. See Defs. Mot. Summ. J. at 4. However, as Defendants correctly argue, PUA benefits are distinct from traditional UI benefits, and as to the former, Plaintiffs have no protectible property interest. Id. at 3–6.

When Congress enacted the CARES Act, it did so to provide a "temporary federal benefit[] to supplement state benefit programs." Moss v. Lee, No. 21-00561, 2022 WL 68388, at *6 (M.D. Tenn. Jan. 6, 2022) (emphasis in original). The statute plainly indicates that participating states may, in their discretion, end their distribution of CARES Act benefits upon 30-days' written notice to the Secretary of Labor. See 15 U.S.C. § 9023(a) ("Any State which is a party to an agreement under this section may, upon providing 30 days' written notice to the Secretary, terminate such agreement."). This authority to continue or end participation makes the nature of the benefits under the CARES Act entirely discretionary. The Supreme Court has long held that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).

Several courts evaluating entitlement claims related to PUA benefits have determined that, because of the discretionary nature of the CARES Act, there is no constitutionally-protected property interest in PUA benefits. For example, in Moss v. Lee, 2022 WL 68388, the plaintiffs were a group of Tennessee residents who received PUA benefits. The plaintiffs alleged that the Tennessee governor's decision to end the state's participation in CARES Act benefit programs

before the Act's natural expiration deprived them of a property interest without due process.  Id. at *1–2.  They sought Tennessee's reinstatement in the program.  Id.  The court rejected the plaintiffs' argument, finding that "federal law allows states to exercise discretion in ending their distribution of the federal supplemental benefits."  Id. at 6.  Noting  that the CARES Act not only fails to limit the state's discretion, but  also specifically grants the state sole discretion to terminate its participation in the federal supplemental benefits, the court reasoned that "[s]uch discretion is enough to place the benefit outside the scope of a property interest."  Id.  It explained that statutory provisions such as this "that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggest[] that recipients of such benefits have no entitlement to them."  Id.[5] (citing Latimer v. Robinson, 388 F. Supp. 2d 841, 847 (M.D. Tenn. 2004)); see also Dickerson v. Texas, No. 21-2729, 2021 WL 4192740, at *3 (S.D. Tex. Sept. 15, 2021) (finding that the State of Texas' regular unemployment benefits are "protected entitlements," but that PUA benefits could be "discretionarily removed" if the governor so chose, and thus "they are not protected nor are they entitlements").

This conclusion cements Defendants' claim that the CARES Act does not confer an entitlement to a protected property interest in PUA benefits.  See Jackson v. Daniel, No. 21-1107, 2022 WL 1157656 (W.D. Tex. Apr. 18, 2022) (dismissing pro se plaintiff's § 1983 due process claim related to pandemic unemployment benefits, because "Plaintiff identifies no state statute, rule, or provision that creates a property right in supplemental unemployment benefits under the CARES Act"); see also Winter v. New Mexico Dep't of Workforce Solutions, No. 21-475, 2023 WL 184115 (D. New Mex. Jan. 13, 2023), appeal dismissed, No. 23-2014, 2023 WL 8889763

---

[5] The court also stated: "It is worthy to note that the Court is not aware of any case that has found a property interest in CARES Act benefits after the state terminated its participation."  Id. at *6. This Court is also not aware of any such case.

(10th Cir. Dec. 26, 2023) ("None of the cases cited by Plaintiffs contain a legal conclusion that there is a property [interest] in PUA.  Conversely, the persuasive authority the [c]ourt relied upon in its Order clearly concludes that there is not a property interest in CARES Act benefits.") (emphasis in original);   Al-Farouk v. Dept. of Labor and Ind. Rel., No. 23-00385, 2023 WL 6796200 (D. Haw. Oct. 13, 2023) (explaining that "'[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms'" (quoting Wedges/Ledges of Cal. v. City of Phoenix, 24 F. 3d 56, 62 (9th Cir. 1994)).   A judge within this district reached a similar result.  Witzke v. Donofrio et al., No. 20-12594, 2021 WL 22467 at *5 (E.D. Mich. Jan. 4, 2021) (holding that the CARES Act established no protectible property interest in PUA benefits).

Plaintiffs' briefing on this issue consistently fails to engage with or acknowledge the difference between PUA benefits and traditional UI benefits.  See Individ. Pls. Resp. at 19–23; Pls. Mot. Summ. J.; Pls. Reply.  Plaintiffs instead argue, though not very clearly, that because the Agency administered the PUA program consistent with its administration of the traditional UI program, the programs are indistinguishable.  Id. at 19–22.  They also argue, without support, that funding sources for PUA and UI were "fluid" between the two programs, and thus the benefits programs are the same.  Id. at 20–21.  Notably, Plaintiffs do not cite any cases that articulate an equivalency between UI and PUA benefit programs.

In sum, Plaintiffs have not met their burden of demonstrating that they have a constitutionally-protected property interest in PUA benefits.  PUA benefits were the product of the states' discretionary participation in the CARES Act.  Plaintiffs are not entitled to a discretionary

benefit.  Therefore, as a matter of law, their PUA-based claims cannot proceed.[6]  The Court grants Defendants' motion for summary judgment as to all of Plaintiffs' PUA-based benefits claims.

### 2.    Traditional UI-Based Claims

Defendants next argue that the Court should grant them summary judgment as to the traditional UI Plaintiffs' due process claims.[7]  See Defs. Mot. Summ. J. at 6–14.  As stated above, the Sixth Circuit recognizes, and neither party disputes, that "[r]ecipients of unemployment compensation have constitutionally-protected property interests in unemployment benefits." Cahoo, supra, 912 F.3d at 900.  The main issue the parties dispute is whether the Agency afforded the UI Plaintiffs with adequate due process in accordance with the law.

Defendants argue that, because they gave each of the named UI Plaintiffs sufficient process in accordance with state law through their notice letters, Plaintiffs have failed to meet their burden to "plead and prove that state remedies for redressing the wrong are inadequate."  Vicory v. Walton, 721 F.2d 1062, 1066 (6th Cir. 1983).  See Defs. Mot. Summ. J. at 6–14.

The Fourteenth Amendment prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "Procedural due process imposes constraints on governmental decisions which deprive individuals of . . . 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976) (punctuation modified).  "At its essence, due

---

[6] The Court need not analyze whether the notices in the Agency's PUA-based communications provided adequate notice from a due process standpoint.  "Only after a plaintiff has met the burden of demonstrating that he possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the process provided the plaintiff in conjunction with the deprivation, or lack thereof, violated his rights to due process."  Warren v. City of Athens, Ohio, 411 F.3d 697, 708 (6th Cir. 2005).

[7] The parties identified four of the named Plaintiffs as traditional UI claimants.  They are Paul Kreps, Marissa Quigg, Andrew Myrold, and Patricia Myrold.  Defs. Mot. Summ. J. at 8–14.

process can be summarized as 'the requirement that a person be given notice of the case against him and an opportunity to meet it.'" <u>Shoemaker v. City of Howell</u>, 795 F.3d 553, 559 (6th Cir. 2015) (internal punctuation and alteration omitted) (quoting <u>Mathews</u>, 424 U.S. 319 at 348–349).

To determine whether due process has been afforded, courts look to the balancing test from <u>Mathews v. Eldridge</u>. <u>See</u> <u>Shoemaker</u>, 795 F.3d at 559. Under this test, courts consider:

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] … [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Id.</u> In analyzing these factors, the Court should consider pre-deprivation and post-deprivation procedures together; where "elaborate procedures for post[-]deprivation review are in place, less elaborate pre[-]deprivation process may be required," and in some cases post-deprivation review alone may be sufficient. <u>Id.</u> (punctuation modified).

The Sixth Circuit explains that <u>Mathews</u> is "less [of] a three-way see-saw, and more [of] a two-step template." <u>Hicks v. Comm'r of Soc. Sec.</u>, 909 F.3d 786, 799 (6th Cir. 2018). It explains that "at some foundational level," the "risk of erroneous deprivation" factor "is dispositive." <u>Id.</u> at 800. However, the court must still consider the interests at stake for both sides and determine whether these factors favor the plaintiffs or the government. <u>See id.</u> at 802. The Court will analyze the adequacy of the Agency's notice under <u>Mathews</u>.

The Agency sent the UI Plaintiffs several letters regarding their UI benefits applications. Though each Plaintiff's notices differed from one another in some respects (i.e., the specific reason that the Agency found a particular Plaintiff's application deficient, and/or Plaintiff-specific additional information the Agency sought), all of the named Plaintiffs received at least three notice letters entitled: (i) "Monetary Determination Plus Important Claim Information;" (ii) "Notice of Determination;" and (iii) "Notice of Redetermination."

All three of these letters contained a section that described the steps a recipient could take if that individual disagreed with the contents of the letter.  Specifically, the monetary determination letter and the notice of determination letters contained a "Protest Rights" section.  This section set forth the steps that a claimant could take to obtain further review of the Agency's determination, a deadline for doing so, and the manner to submit such protests.  See, e.g., Kreps's 8/5/20 monetary determination letter (Dkt. 118, PageID.4157–4158); Quigg's 5/22/20 notice of determination letter (id. at PageID.4212–4213).

Specifically, the letters entitled notice of redetermination contained an "Appeal" section. See e.g., A. Myrold's 10/6/22 notice of redetermination letter (id., PageID.4231–4232).  The section set forth clear instructions regarding how a Plaintiff could submit an appeal, including the manner of submitting the appeal, an invitation to submit attachments in support of the appeal, and the applicable deadlines.  Id.

In applying the Mathews factors to the Agency's notice letters, the Court finds that, on balance, the letters provided Plaintiffs with adequate notice and an opportunity to be heard regarding each step of the way in the Agency's determination process.

In reviewing the notice letters, the Matthews factors are evaluated in the context of this particular case.  The first Mathews factor weighs in Plaintiffs' favor.  Plaintiffs have a strong interest in obtaining UI benefits that they are otherwise entitled to receive.  Indeed, as discussed, Plaintiffs have a constitutionally-protected property interest in receiving those benefits.  See Cahoo, 912 F.3d at 900.  As to the third Mathews factor, the government has an interest "in preserving fiscal and administrative resources."  See id. at 902.  This favors Defendants.

The second—and most significant—Mathews factor weighs in favor of Defendants.  See Hicks, 909 F.3d at 799.  This factor requires the Court to evaluate whether the Agency's notice

letters provided an adequate safeguard against the risk of erroneous deprivation. The Agency's letters to each Plaintiff set forth notice of what the discrepancy was, an explanation of why the discrepancy resulted in an adverse finding, an opportunity to present more or different information in the form of a protest or appeal, the method and deadlines for doing so, and an explanation that the decision could be heard by a neutral decisionmaker.

For example, Plaintiff Marissa Quigg's notice of determination letter sets forth the issues and sections of the MES Act involved. Quigg's 5/22/20 notice of determination letter (Dkt. 118, PageID.4214). It states: "Voluntary Quit and 29(1)." It explains "You quit your job with JEWISH FAMILY SERVICES OF WASHTENAW COUNTY INC on January 24, 2020 in anticipation of discharge. You did not work until the last day your employer intended to terminate your employment and continuing work was available. Your leaving was without good cause attributable to the employer." Id. It goes on to state, "You are disqualified for benefits under MES Act Sec. 29(1)(a)." Id. It explains her right to obtain review of the decision and the requirements for doing so: "If you disagree with this determination you have the right to protest requesting a redetermination. Your protest must be received within 30 calendar days . . . You can attach copies of any documents that support your protest . . . You can submit your protest online . . . [or] in writing . . . It must be signed." Id. at PageID.4213.

Similarly, Quigg's notice of redetermination letter explains that "No new or additional evidence has been provided to warrant a reversal in the prior determination." 7/20/20 notice of redetermination letter (Id. at PageID.4214–4215). It, too, explains how and when to submit an appeal of the decision. Id. These letters, and the others that the three other UI Plaintiffs received, all provided the claimants with notice and an opportunity to be heard.

Significantly, the letters explain that the Agency would continue making benefits payments to the claimants until the agency decision became final.  For example, Quigg's notice of determination letter states: "In accordance with the provisions of the MES Act, benefits payable because [of] this determination [sic] will be paid, even though a protest may be filed later. **However, if a later redetermination or decision holds that you were not entitled to receive all or part of these benefits, you may be required to repay the benefits improperly received.**"[8] 5/22/20 notice of determination letter (Id. at PageID.4213) (emphasis in original).  Accordingly, Plaintiffs were not deprived of benefits before they had notice and an opportunity to be heard.

Again, Plaintiffs' briefing does not address the adequacy of the notice letters.  Instead, Plaintiffs' position is that: (i) the Agency determined that Plaintiffs were eligible to receive benefits and (ii) the Agency improperly withheld benefits "without providing any determination otherwise."  Individ. Pls. Resp. at 24.  Their briefs repeatedly ignore the Agency's letters and instead argue that Plaintiffs did not receive "any determination or any notice and opportunity to respond." Id. at 2.  Plaintiffs are simply incorrect that the Agency failed to provide the UI Plaintiffs with any notice or an opportunity to be heard about their claims.  Not only did Plaintiffs receive the notice letters, they also all undertook, to varying degrees of success, one or more steps of the protest and/or appeal processes.

For example, the Agency sent Kreps a letter indicating that it required identification verification and a deadline to provide such verification for further consideration.  See 8/5/20 request for information letter (Dkt. 118, PgID.4159–4160).  Kreps did not provide verification by

---

[8] Although Plaintiffs have generally argued that the Agency placed SPI and BPR holds on claimants' claims, they have not argued that the Agency placed such flags on any of these specific Plaintiffs' files.  Only Defendants provide some limited facts regarding which named Plaintiffs were subject to SPIs.  See Defs. Resp. at 8–10.  They acknowledge that Kreps is the only UI Plaintiff who was flagged with an SPI. Id.

the deadline, and the Agency sent him a notice of determination indicating such.  See 10/12/20 notice of determination letter (id. at PgID.4203–4204).  After the deadline, Kreps provided his identification verification and the Agency ultimately redetermined that he was eligible to receive benefits.  See 4/13/21 notice of redetermination letter (id. at PgID.4205–4206).  The process, accordingly, resulted in a decision in Kreps's favor in the end.[9]

Quigg received a notice of determination letter indicating that she was ineligible for benefits because she left her last position without good cause attributable to her employer.  See 5/22/20 notice of determination letter (Id. at PageID.4212–4214).  The Agency provided Quigg with a deadline by which to provide requested information demonstrating her qualification for benefits, but she did not do so in a timely manner.  Id.  Accordingly, the Agency issued a notice of redetermination letter indicating Quigg's disqualification and denial.  See 7/20/20 notice of redetermination letter. (Id. at PageID.4214–4215).  Quigg then began the appeal process set forth in the redetermination letter, wherein she received an adjudication from the Michigan Department of Licensing and Regulatory Affairs affirming the denial.  See 3/1/22 LARA Order (Id. at PageID.4218–4224).  Quigg did not take further appeals, and that decision became final.

Myrold similarly undertook the appeal process set forth in the Agency's letters resulting in decisions from the Unemployment Insurance Appeals Commission and the state court.  See Jackson Co. ruling (Id. at PageID.4270–4273).  Patricia Myrold similarly received notices, and made calls to the Agency, but did not follow the protest and/or appeal process when she received an adverse decision.  See Decl. James Burton, Unempl. Ins. Examiner (Id. at PageID.4340–4342).

---

[9] The Court understands from the parties' briefs that the Agency has not yet paid Kreps because it requested, and he failed to provide, updated payment information.  See 4/13/21 notice of redetermination letter (Dkt. 118 at PageID.4207); see also, Defs. Mot. Summ. J. at 11.

Next, the Court briefly addresses Defendants' argument that the process set forth in their Notice letters follows the process and procedure they are required to follow under state law. Mich. Comp. Laws § 421.32a sets forth that the Agency must undertake a review when an applicant requests one, and then must make a determination or redetermination itself or refer the matter to an administrative law judge. Id. This, Defendants argue, is exactly the process they provided. The Court agrees.

The opportunity to supply information means the risk of erroneous deprivation was minimized, and the process Defendants followed was fair and in accordance with state law. Plaintiffs have not met their burden of demonstrating that they should prevail on their due process claim as a matter of law. Indeed, the contrary is true. The adequacy of notice and the opportunity to be heard establishes that Plaintiffs' constitutional claims regarding traditional benefits are without merit, and that judgment should be entered in favor of Defendants on these claims.

This leaves only the UAW's Zynda-based claims.[10]

## B.  Defendants' Motion for Summary Judgment-- Zynda Claims

Defendants also seek judgment in their favor on the Zynda-based claims. Defs. Mot. Summ. J. at 18–20. Before discussing their arguments for summary judgment, the Court sets forth the following background to the Plaintiffs' allegations related to Zynda. As discussed below, despite Zynda being discussed in several counts, the only viable one is Count IV.

Plaintiffs mention Zynda in Counts II, III, and IV of the complaint. 2d. Amend. Compl. Plaintiffs allege in Count II that the Agency did not adjudicate protests and appeals in a timely manner and that the Agency "often seek[s] to recoup overpayments . . . even though there is no

---

[10] Because the Court has dismissed the constitutional claims and all individual Plaintiffs, it need not address Defendants' remaining arguments for dismissing these claims and parties (i.e., qualified immunity, respondeat superior, abstention, insufficient basis for injunctive relief).

final Determination on their eligibility." Id. ¶ 267.  Plaintiffs' only mention of Zynda in Count II is: (i) in its heading, which states: "Violation of . . . Zynda (on behalf of individual plaintiffs and the prompt appeal class)" and (ii) a statement that the Agency "consented to the jurisdiction of this court… under Zynda." Id. ¶ 272.

Plaintiffs address Zynda with more specificity in Count III.  In that count, they allege: "this [premature] collection activity violates Paragraph 13 of the [Zynda] Agreement, which that [sic] 'the Agency shall not initiate or continue recovery of an overpayment or penalty until a (re)determination of the overpayment becomes final after the claimant has had notice and reasonable opportunity to challenge the (re)determination and/or exhaust all appeals.'" Id. ¶ 290.

Count IV, which only the UAW brings, alleges that the Agency violated Paragraphs 13 and 14 of the Zynda Agreement.  Id. ¶ 304–305.  Those paragraphs state:

> 13. The Agency shall not initiate or continue recovery of an overpayment or penalty until a (re)determination of the overpayment becomes final after the claimant has had notice and reasonable opportunity to challenge the (re)determination and/or exhaust all appeals.
>
> 14. During the pendency of a decision on any overpayment or misrepresentation (re) determination, the Agency will continue to make timely UC payments when due and shall not make any attempts to collect restitution while an appeal is pending, and shall not begin collection of restitution or penalties until or after 35 days from the date of a (re)determination.

Zynda Agr. at 5.

Count IV is the only viable count as to Zynda.  Counts II and III are brought by individual and putative class Plaintiffs.  Plaintiffs have not alleged that any of them, other than the UAW, are parties to the Zynda Agreement.  Under Michigan law, a non-party cannot sue for breach of contract unless they are intended, not incidental, third-party beneficiaries to the contract.  See Schmalfeldt v. North Pointe Ins. Co., 790 N.W.2d 629, 654 (Mich. 2003).  The Individual Plaintiffs do not allege in the amended complaint, nor argue in their motion or responses that they are

intended third-party beneficiaries with the right to enforce the <u>Zynda</u> Agreement.  This leaves only the UAW as a viable plaintiff, and  the only count that the UAW brings is Count IV.[11]

In their summary judgment motion, Defendants first argue that the UAW Plaintiffs did not comply with the notice provisions in the settlement agreement before suing.  <u>Id.</u>  Defendants next argue that they did not breach the <u>Zynda</u> Agreement in the first place.  <u>Id.</u> at 19–20.  Because there are factual issues as to both points, Defendants' motion is denied.

### 1.     Pre-Suit Notice Provision

Defendants first argue that the UAW Plaintiffs did not comply with the notice provisions in the <u>Zynda</u> Agreement before suing.  Defs. Mot. Summ. J. at 18.  They argue that Paragraph 23 of the <u>Zynda</u> Agreement required, among other things, that "Plaintiffs shall give the Agency written notice of such alleged breach providing the opportunity to cure such breach for a period of thirty (30) business days after delivery of the notice."  <u>Zynda</u> Agr. at 7–8.  Paragraph 23 also states that "Any notice of breach shall be made to the following" and lists the UIA Deputy Director as the individual designated to receive notice.  <u>Id.</u>

Defendants emphasize that the notice provision includes mandatory terms (i.e., "The notice <u>shall</u> be made . . . ."  Defs. Mot. Summ. J. at 18 (emphasis in original)) and that the UAW did not follow that provision before joining this lawsuit on November 28, 2022.  <u>Id.</u>  Specifically, they argue that the Agency sent three notices: first, on September 2, 2021, second, on November 14, 2022, and third, on July 19, 2023.  As to these three notices, they argue that: (i) the UAW was not identified as the author on the first notice, nor was the notice authored by a known UAW official;

---

[11] The briefing on the <u>Zynda</u> claims is disjointed.  Defendants' summary judgment motion focuses on Count II, <u>see</u> Defs. Mot. Summ. J. at 19,  while Plaintiffs' response focuses on Count IV.  <u>See</u> UAW Pls. Resp. at 19 (Dkt. 131).  Because Count IV is the only viable count, the analysis focuses on  Count IV.

and (ii) two of the UAW's notices were not sent to the UIA Deputy Director, who is the only individual the Agreement identifies to receive notice.  Def. Mot. Summ. J. at 18–19.  Thus, Defendants argue, Plaintiffs did not comply with the mandatory terms of Paragraph 23.  Id.

Plaintiffs' response argues that they gave notice "[c]onsistent with the settlement agreement."  UAW Pls. Resp.  at 6-7.  They argue that they sent the first notice to Berry, the UIA Deputy Director.  Id. at 7.  In response to Defendants' argument that the UAW was not identified as the sender, they argue "who is the letter possibly on behalf of if not for the plaintiffs to the Zynda Agreement, including the UAW?"  Id. at 15.  They argue that it is obvious that a notice letter under the Zynda Agreement was from the UAW, which was a party to the Agreement.  Id.

Plaintiffs explain that they sent the second and third notices to counsel for the Agency, rather than the UIA director.  Id. at 8–9.  They explain that they did not send these notices to the UIA deputy director because of the impropriety of a lawyer for a party contacting a represented party directly, as by then, this litigation was pending.  Id. at 6–7, 14.  They additionally argue that the deputy director, in fact, received all notices and then passed them along to the legal department in any event. See id. at 16–17.  She testified, "I understood my role was to make sure that as liaison I liaisoned between [Mr. Blanchard] and the Agency. So once the information was received, I provided it to Legal." Id. (quoting Berry Dep. Tr. at 22).

Whether Plaintiffs complied with the notice provision in the Zynda Agreement cannot be resolved as a matter of law.  It is unclear whether the agreement required strict compliance with the notice provision or whether substantial compliance would be sufficient.  It is also unclear how any Defendant would have been prejudiced by the lack of compliance.  These are matters that will require further factual development.  Accordingly, Defendants' motion for summary judgment cannot be granted based on lack of notice.

2.      __Zynda__ Claims Merits

Defendants argue that they did not violate the law or the __Zynda__ Agreement when they suspended payments and/or initiated collection activity before a determination or redetermination was "final."  Defs. Mot. Summ. J. at 19–20.  They explain that, under Michigan law, the Agency is permitted to suspend benefits payments after it issues an adverse decision; it need not wait for "finality."  __Id__.  Mich. Comp. Laws § 421.27(a)(1) states, in relevant part, "When a determination, redetermination, or decision is made that benefits are due an unemployed individual, the benefits become payable from the fund and continue to be payable to the unemployed individual, . . . until the determination, redetermination, or decision is reversed."  This, they argue, is the process the agency followed.  Defs. Mot. Summ. J. at 19.

Defendants argue that, if the __Zynda__ Agreement requires "legal finality" before the Agency can stop payments or recover overpayments, then the __Zynda__ Agreement impermissibly goes beyond what is required under Michigan law.  __Id.__ at 20.  Defendants point out that, under Paragraph 28 of the __Zynda__ Agreement,[12] when a provision of the Agreement conflicts with state law, then state law prevails.  __Id__.  Thus, Defendants cannot be obligated to wait for "finality."  __Id__.

In response, Plaintiffs argue that Paragraphs 13 and 14 do not conflict with state law.  UAW Plf. Resp. at 20–23.  They further argue that paragraph 28 is "narrower than defendants allow."

---

[12] Paragraph 28 states:

> 28. Construction. Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law, and whenever there is any conflict between any provision of this Agreement and any statute, law, ordinance, regulation, or U.S. Department of Labor direction, guidance, or UIPL, contrary to which the parties have no legal right to contract, then the latter shall prevail; but in such event, the provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within legal requirements and subject to the procedures of the preceding paragraph.

Zynda Agr. at 10.

Id. And, they argue, the <u>Zynda</u> Court already found that due process was lacking in the Agency's misrepresentation (fraud) determinations.[13] This, they explain, is the reason why the parties negotiated the settlement agreement to be worded as it is: to ensure that benefits would not be terminated before a claimant was afforded due process. <u>Id.</u> at 20–21.

This issue cannot be decided as a matter of law on the briefs. Defendants' position on the proper interpretation of Paragraph 28 would essentially eviscerate the protections that appear to be provided by Paragraphs 13 and 14. Because the latter provisions appear to require a final determination and exhaustion of appeals before termination of benefits, Defendants' position suggests that the protection of those provisions is other than what it might appear to be, and possibly illusory. While courts look to the language of an agreement to discover the parties' intent, extrinsic evidence may be admissible when there is ambiguity. <u>See</u> <u>Shay v. Aldrich</u>, 790 N.W.2d 629, 642–643 (Mich. 2010) (holding that when construing a release contained in a settlement agreement, courts are "obligated . . . to effectuate the intent of the parties, and extrinsic evidence is admissible to the extent necessary to do so"). And examination of extrinsic evidence may be necessary to evaluate whether a latent ambiguity exists. <u>Id.</u> at 668 ("To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation."). On this record, the intent of the parties is not clear. Therefore, further factual development will be required to understand how these provisions were designed to operate.

Accordingly, the Court denies summary judgment as to the <u>Zynda</u> claims.

---

[13] Plaintiffs fail to provide the Court with a citation to the <u>Zynda</u> record for this assertion. As such, they failed to comply with the Case Management Order (Dkt. 42), which requires that factual matter in motions and responses be supported by citations to the record. <u>See id.</u> at IIB4.

C.      **Plaintiffs' Motion for Partial Summary Judgment**

In their motion, Plaintiffs seek to have the Court order prospective injunctive relief as to

Defendant Dale in her official capacity.  Pls. Mot. Summ. J. at 1–2.  Specifically, Plaintiffs request

the following:

> An order: 1) granting partial summary judgment on the legal issue and finding the
> practice of suspending benefits without pre-termination notice and opportunity to
> be heard violated the due process clause of the constitution by depriving Plaintiffs
> of benefits when due; 2) Ordering an appropriate prospective injunction directing
> the Director in her official capacity to cease the practices that result in this
> unconstitutional condition.

Id. at 1–2.

The motion and supporting arguments seek relief regarding  Plaintiffs' constitutional claims

only. However, the Court has now awarded Defendants summary judgment on those claims.  The

Court, therefore, denies Plaintiffs' motion for partial summary judgment (Dkt. 71).

## III.   CONCLUSION

For the reasons explained above, the Court denies Plaintiffs' motion for partial summary

judgment (Dkt. 71).  It grants in part and denies in part Defendants' motion for summary judgment

(Dkt. 110).

SO ORDERED.

Dated: March 24, 2025                                    s/Mark A. Goldsmith
Detroit, Michigan                                       MARK A. GOLDSMITH
                                                        United States District Judge